IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>       Plaintiff,<br><br> -against-<br><br>ROBERT BRIAN THOMPSON,<br><br>       Defendant. | Case No. 3:24cv800 _____<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Defendant Robert Brian Thompson ("Thompson"), alleges as follows:

### SUMMARY

1. From at least October 2023 through January 2024 (the "Relevant Period"), Thompson, then a senior banking supervisor and examiner at the Federal Reserve Bank of Richmond (the "Federal Reserve Bank"), unlawfully traded in stocks and options of at least two banks that were under his supervisory purview based on inside information.

2. As a senior employee at the Federal Reserve Bank – one of twelve regional Federal Reserve banks that supervise and regulate the U.S. banking system under the oversight of the Board of Governors of the Federal Reserve System (collectively, the "Federal Reserve") – Thompson had regular access to material nonpublic information about numerous publicly-traded banks, including unreleased earnings data; capital, liquidity, and risk levels; and records of bank examinations, stress tests, and other regulatory events.  For that reason, the Federal Reserve's policies and procedures required Thompson to keep confidential (and not use for any non-official purposes) all nonpublic information obtained through his work.

3. In addition, a federal regulation prohibited Thompson from trading in bank securities altogether, given the conflict of interest such trading would create with his supervisory and regulatory responsibilities.

4. Nevertheless, during the Relevant Period, Thompson used material nonpublic information that he obtained through his work at the Federal Reserve Bank to trade in stock and options of at least two publicly-traded banks within his supervisory portfolio – New York Community Bancorp, Inc. ("NYCB") and Capital One Financial Corporation ("Capital One").

5. Thompson attempted to evade scrutiny for his unlawful trading by submitting false certifications to the Federal Reserve. Thompson's certifications falsely represented that he had no bank securities holdings and had not engaged in any trading prohibited by law or Federal Reserve policy, which he knew was untrue.

6. Thompson placed each of his unlawful trades on the basis of material nonpublic information he received from his job about the relevant bank's upcoming earnings announcement or other disclosure that Thompson knew or believed would cause the stock price to move in a direction favorable to his stock or options position.

7. In placing each of those trades, Thompson knew or at least recklessly disregarded that he was trading based on information that was material and nonpublic and that using the information to enrich himself through trading was a breach of his duties as a Federal Reserve Bank employee.

8. Through his unlawful trades, Thompson obtained ill-gotten profits of at least $584,873.

## VIOLATIONS

9. By virtue of the conduct alleged herein, Thompson violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

10. Unless Thompson is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

11. The Commission brings this action pursuant to the authority conferred upon it by Exchange Act Sections 21(d) and 21A [15 U.S.C. §§ 78u(d) and 78u-1].

12. The Commission seeks a final judgment: (a) permanently enjoining Thompson from violating the federal securities laws and rules this Complaint alleges he violated; (b) ordering Thompson to disgorge all ill-gotten gains he received as a result of the violations alleged herein and to pay prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)]; (c) ordering Thompson to pay civil money penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1]; and (d) ordering any other relief the Court may deem just and proper.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to Sections 21, 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u, 78u-1, and 78aa].

14. Thompson, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

15. Venue in this District is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Defendant may be found in, is an inhabitant of, and transacts business in the Eastern District of Virginia, and certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred in this District, including Thompson's misappropriation of material nonpublic information concerning certain bank issuers from his employer (located in this District) and placing or directing trades on the basis of that material nonpublic information.

## DEFENDANT

16. **Thompson**, age 43, is a resident of Moseley, Virginia. From 2004 through approximately May 2024, Thompson was employed at the Federal Reserve Bank in various banking regulatory, supervisory, and examination functions.

## OTHER RELEVANT ENTITIES

17. **The Federal Reserve Bank** is one of the twelve regional Federal Reserve banks that supervise and regulate the U.S. banking system under the Federal Reserve's oversight.

18. **NYCB** is a Delaware corporation headquartered in Hicksville, New York. NYCB is a bank holding company subject to supervision, examination, and regulation by the Federal Reserve. NYCB's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the New York Stock Exchange under the ticker symbol

"NYCB." NYCB files periodic reports, including Forms 10-K and 10-Q, with the Commission pursuant to Section 13(a) of the Exchange Act and related rules thereunder.

19.     **Capital One** is a Delaware corporation headquartered in McLean, Virginia. Capital One is a bank holding company subject to supervision, examination, and regulation by the Federal Reserve. Capital One's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the New York Stock Exchange under the ticker symbol "COF." Capital One files periodic reports, including Forms 10-K and 10-Q, with the Commission pursuant to Section 13(a) of the Exchange Act and related rules thereunder.

## FACTS

### I.     BACKGROUND

**A.     Through His Work at the Federal Reserve Bank, Thompson Had Regular Access to Material Nonpublic Information about Publicly-Traded Banks.**

20.     From 2022 through approximately May 2024, Thompson served as Deputy Central Point of Contact for Large & Foreign Banking Organizations at the Federal Reserve Bank.

21.     In that role, Thompson managed a team whose primary responsibility was to supervise and conduct examinations of Large Banking Organizations – U.S. banking firms with total assets of at least $100 billion but excluding the eight largest U.S.-based, global, systemically-important banks.

22.     In his day-to-day work, Thompson regularly received, reviewed, communicated, and otherwise had access to highly confidential and sensitive information (including material nonpublic information) about all 18 institutions within the Large Banking Organizations portfolio, which included NYCB and Capital One.

5

23. Thompson could access this information in various ways, including through systems and databases available to Federal Reserve staff (but not the public) and through communications with other Federal Reserve personnel.

**B.   Thompson Controlled Brokerage Accounts in His and/or His Wife's Names.**

24. During the Relevant Period, Thompson and his wife held several trading and brokerage accounts (the "Thompson Accounts").

25. Thompson had full trading authority over all the Thompson Accounts.

26. Thompson conducted all trading in the Thompson Accounts during the Relevant Period.

**C.   Thompson Was Prohibited from Trading in Bank Securities and from Disclosing or Trading on Material Nonpublic Information Obtained Through his Employment, and He Submitted a False Certification on That Topic.**

27. During the Relevant Period, Thompson was subject to the Federal Reserve Bank's Code of Conduct, which included the following directives (emphases added):

> [Federal Reserve Bank] examination and other bank or bank holding company supervisory information is the property of the Board of Governors of the Federal Reserve System ('Board') and may be disclosed only in accordance with Board procedures.
>
> …
>
> In the course of working at the [Federal Reserve Bank], an employee may have access to non-public information. Non-public information is information that the employee knows, or reasonably should know: (a) has not been made available to the general public; (b) is designated as confidential, private or proprietary; or (c) is routinely treated by the [Federal Reserve Bank] as confidential … An employee must strictly preserve the confidentiality of such information. It can be disclosed only as required for [Federal Reserve Bank] purposes and only as authorized.
>
> …
>
> An employee is prohibited from using non-public information for any purpose other than [Federal Reserve Bank] business. **In addition, an employee may not engage, directly or indirectly, in any financial transaction as a result of, or in reliance on, non-public information, whether such information relates to the [Federal Reserve Bank] or any**

6

**other person or institution. An employee may not allow the improper use of such non-public information to further the employee's own private interest or that of another person….**

28.     A federal regulation, 5 C.F.R. § 6801.103, also prohibited Thompson from trading in bank securities altogether (subject to certain exceptions not applicable here) – irrespective of any material nonpublic information – because of his role as an employee of a bank regulator. That regulation provided, "Prohibited interests: Except as permitted by this section, an employee [of the Federal Reserve], or an employee's spouse or minor child, shall not own or control, directly or indirectly, any debt or equity interest in… [a] depository institution or any of its affiliates."

29.     Each year, Thompson was required to complete an annual certification form acknowledging the trading restrictions and disclosing, among other things, any bank securities holdings as well as any actual or apparent conflicts of interest or violations of law or Federal Reserve policy.

30.     On approximately August 9, 2023, Thompson submitted his required annual certification form for fiscal year 2023.

31.     In this form, Thompson reported that he held no bank securities, had no actual or apparent conflicts of interest, and had committed no violations of law or Federal Reserve policy.

32.     In reality, as of the date of his certification, Thompson held bank stock and options with a market value exceeding $500,000 in the Thompson Accounts, none of which he reported.

33.     In addition, Thompson failed to report that he opened and closed stock or options positions in several bank issuers earlier in the year in transactions that were prohibited and that created actual or apparent conflicts of interest with his supervisory responsibilities.

## II. THOMPSON MISAPPROPRIATED MATERIAL NONPUBLIC INFORMATION FROM THE FEDERAL RESERVE BANK AND USED IT TO TRADE BANK STOCKS AND OPTIONS.

### A. Thompson Knowingly Traded in Capital One Stock Based on Material Nonpublic Information He Received Through His Work.

34. On October 11, 2023, Thompson received an email from a Federal Reserve colleague attaching a "preview" of Capital One's third quarter 2023 earnings, showing earnings per share ("EPS") significantly exceeding market analysts' estimates – a positive result.[1]

35. The email and its attachment were replete with material nonpublic information collected or prepared by Federal Reserve staff in connection with its supervision of Capital One.

36. On October 26, 2023, just hours before Capital One was scheduled to release its earnings for the third quarter to the public, Thompson purchased 7,500 Capital One shares in the Thompson Accounts at a total cost of $678,000 – or an average price of $90.40 per share.

37. When the market closed on October 26, 2023, Capital One's stock traded at $89.51 per share.

38. After the market closed, Capital One publicly announced its third quarter earnings, and the numbers were substantially similar or identical to the positive results reflected in the earnings "preview" Thompson received two weeks earlier.

39. As a result of Capital One's positive earnings announcement, the company's stock price rose the next day, October 27, 2023. When the market closed, Capital One's stock traded at $97.74 per share, an increase of 9.19% from the previous day's closing price.

---

[1] EPS measures the monetary value of a corporation's net earnings per outstanding share of common stock in a given period, and is a key measure of corporate profitability. Financial analysts that track a company's performance often publish estimates of the company's EPS to help investors predict how the company will ultimately perform during the period. When a company's EPS exceed analysts' estimates, the company's stock price typically reacts favorably. In contrast, when a company's EPS for a given period fall below analysts' previously published estimates, the stock price often drops as a result.

40. Thompson sold his Capital One stock at an average price of $100.98 per share, realizing ill-gotten profits of approximately $79,346.

**B.    Thompson Knowingly Traded in NYCB Options Based on Material Nonpublic Information He Received Through His Work.**

41. Between January 18 and January 26, 2024, Thompson learned, via work-related communications with other Federal Reserve staff, that NYCB would soon be announcing substantial, unexpected losses related to loans it acquired as part of its March 2023 acquisition of a distressed bank, Signature Bank N.A. ("Signature Bank").

42. During this period, Thompson exchanged a series of emails and instant messages with Federal Reserve colleagues in which they discussed NYCB's upcoming year-end earnings release (scheduled for January 31, 2024) and what the disclosure of the loan losses might mean for NYCB's stock price and the financial results of other banks with similar risk profiles.

43. For example, on January 18, 2024, Thompson electronically messaged a Federal Reserve colleague, whose supervisory work at that time was focused on NYCB, and wrote "well i know you said earning[s] will be bad," and speculated about how the news would impact NYCB's stock price once it was disclosed. The next week, on Friday, January 26, 2024, Thompson messaged the same colleague and noted that "NYCB might be ok."

44. On the morning of Monday, January 29, 2024, at approximately 9:56 a.m., Thompson messaged a different colleague asking for a "sneak peek at whatever the issue is [with] NYCB so I can get a head start on [another bank's] exposure that we know is coming."[2] The other bank Thompson referred to was another bank in the Large Banking Organizations portfolio that acquired a different distressed institution in March 2023 under circumstances similar to NYCB's acquisition of Signature Bank that same month.

---

[2]    All times set forth herein are in Eastern Time.

9

45. Less than two hours after emailing his colleague, on January 29, 2024, between approximately 11:13 a.m. and 11:38 a.m., Thompson purchased a total of 1,600 out-of-the-money put option contracts with an expiration date of February 16, 2024 – contracts that would allow Thompson to make money if NYCB's stock price fell by the February 16 expiration date – in the Thompson Accounts at a total cost of approximately $14,495.[3]

46. Thompson's January 29 NYCB put option purchases accounted for more than 99% of the total trading volume in those put options on his purchase date.

47. The next day, on January 30, 2024, NYCB's stock traded at a price of $31.14 per share when the market closed.

48. On Wednesday, January 31, 2024, before the market opened, NYCB publicly announced its 2023 fiscal year-end earnings results, with EPS coming in significantly below market analysts' estimates – a negative result driven by hundreds of millions of dollars' worth of previously-undisclosed loan losses related to NYCB's Signature Bank acquisition.

49. Later that day, at approximately 4:40 p.m., Thompson sent an email to several Federal Reserve colleagues in which he acknowledged that he had known the week before that NYCB would be announcing bad news: "Last week, [my team] caught wind of a potential credit issues (sic) at NYCB and began to monitor and prepare for the earnings release today."

50. By the close of trading that day, NYCB shares traded at $19.41 per share – a price 37% lower than the stock's closing price the previous day.

---

[3] A put option contract gives its buyer the right, but not the obligation, to sell 100 shares of the underlying stock at a specified price (the "strike price") on or before the expiration date in exchange for paying a premium up front. Generally, the buyer of a put option expects that the price of the underlying stock will fall on or before the expiration date, allowing the buyer to profit by acquiring the stock at market price and selling it at the higher strike price.

51.     The next day, Thursday, February 1, 2024, Thompson sold his NYCB put options and obtained ill-gotten profits of approximately $505,527 – representing a return of approximately 3,745.2% in less than a week.

### III.     THOMPSON AGAIN FALSELY CERTIFIED IN REQUIRED DISCLOSURE FORMS THAT HE HELD NO BANK SECURITIES AND ENGAGED IN NO PROHIBITED TRADING.

52.     During the Relevant Period, the Federal Reserve required that employees promptly report any changes to their annual certification forms concerning securities holdings in banks, potential conflicts of interest, and other matters.

53.     On or about March 12, 2024, Thompson submitted an amended certification form for 2023 in which he reported a potential conflict of interest arising out of discussions he was having with Capital One about potential employment at the bank.

54.     Once again, Thompson reported no bank securities holdings and no actual or apparent conflicts or violations related to trading, despite having opened and closed stock or options positions in several bank issuers (including NYCB and Capital One) in prohibited, conflict-creating trades, based on material nonpublic information, since the date of his previous August 2023 certification.

### FIRST CLAIM FOR RELIEF
### Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

55.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 54.

56.     Thompson, directly or indirectly, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material

fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

57. By reason of the foregoing, Thompson, directly or indirectly, violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Thompson from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Ordering Thompson to disgorge all ill-gotten gains he received directly or indirectly, with prejudgment interest thereon, as a result of the alleged violations pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)];

### III.

Ordering Thompson to pay civil monetary penalties under Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

### IV.

Granting any other and further relief this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action of all issues so triable.

Dated: November 8, 2024

Respectfully submitted,

/s/ Timothy K. Halloran
Timothy K. Halloran (VSB No. 48352)
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C. 20549
Tel: (202) 551-4414 (Halloran)
Email: hallorant@sec.gov

Joseph G. Sansone*
Lindsay S. Moilanen*
Derek M. Schoenmann*
David Bennett*
U.S. SECURITIES AND EXCHANGE COMMISSION
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
Tel: (212) 336-9113 (Schoenmann)
Email: schoenmannd@sec.gov
*Appearing pursuant to Local Civil Rule 83.1(D)(2)

Attorneys for Plaintiff